The matter is John Thorpe et al. versus Borough of Jim Thorpe et al. And Mr. Schwab, if you'd be so kind to be the first. May it please the Court, I would ask that two minutes be reserved for rebuttal. Okay. 124 years ago, the Supreme Court indicated that relations between husband and wives were the province of the states and not the United States. Justice Kennedy, in a unanimous decision in favor of this, found that the disposition of the body of the deceased is also a constitutional right. But that wasn't the situation. Are you going toward the constitutionality of the statute here? I believe the statute as it's written is constitutional. How it was applied by the district court, I believe, is where the problem is. Okay, but that's been waived, hasn't it? Excuse me? Wasn't that argument waived? Did you make that argument in the district court? We don't believe we did, Your Honor. We don't believe we waived that, because we don't... Where did you make the argument? Excuse me? Where did you make the argument? We believe we originally made it when we filed our motion to dismiss, and that the court at that point indicated that it wasn't proper. Okay, I don't have the motion in front of me, but you can use your term however you like. Okay, but if in the event, Your Honor, you would believe that it was waived, the Third Circuit has previously ruled that with matters of public interest, such as this, that the court has the ability to hear it and determine it, because it's a matter of discretion rather than jurisdiction. Okay. But you're arguing about the right of the deceased spouse? Yes, in this case... What is your standing to be able to bring her constitutional interests to the court? The standing of the deceased spouse, Your Honor, is that she contracted with the borough to provide a grave site. Now, what is your standing, though, to do it on her behalf? We're actually not... We're bringing it on behalf of the borough because we have a contractual obligation to the widow. And as a contractual obligation to the widow, we have to uphold contracts that we have with third parties. Yeah, but any contract would have as an implicit part of the contract any countervailing statute. You couldn't have a contract that ignored a statute. The statute would have to be read into the contract implicitly. Well, in this case, the contract was written before the statute was ever adopted. We have a situation here where the savings clause of NAGPRA actually says that it was not to, in any way, interfere with rights of third parties. Okay, maybe that's the best way to proceed, then. Why don't you focus on the savings clause? The savings clause, Your Honor, indicated that nothing in the statute would be construed to limit any procedural or substantive right which may otherwise be secured to individuals. In this case, there was a right both to the borough and to the spouse that she had a right under California law to determine where her husband would be buried. She made that right. Raised in a state in California. And you raised in your brief, or one of the amicus did, I suppose, that I guess taken to its extreme, any Native American who passes on could not pick or choose where they would be buried for fear that later, in future generations, they'd be exhumed and put elsewhere. I believe that was in the amicus of the first family, yes, Your Honor. It's a situation where state courts have traditionally delved into it. They've handled family disputes. We don't believe NAGPRA was intended to be a sword in a family dispute. And essentially, that's what we see this as being. This was ongoing. There was a first family with three daughters who were opposed to any removal of the father. The plaintiffs waited until she died to bring the action, even though they were aware of it for over, in one case, 20 years, in the other, 50 years, just because they didn't want to get involved in the family dispute. Everyone was never at the table in this litigation. State court would allow everyone to be there, all the family members. The 11 that are not part of this litigation that the borough had asked to be joined. You had asserted an equitable defense of latches. I don't know whether that's going to rule the day, but I was thinking about another one in dealing with acquiescence. I have a quote from a court. The difference between acquiescence and latches is that latches denotes passive consent, while Wasn't there active consent here through the widow entering into an agreement? Well, there was active consent by the widow. There was active consent by the three daughters from the first family. The sons from the second family that were opposed to it took no action. It was acquiescence by non-action. Right. They had knowledge. There is no question there has been knowledge in this case. Right. What happened, if it's in the record, what happened during the initial tribal or indigenous ceremony? Apparently there was an indigenous ceremony, burial ceremony that started, and that was interrupted. Is that in the record? No, it's not, Your Honor. Okay, then don't answer that. I mean, there's a lot that was in the appellee's brief that is not in the record. Nothing has been documented to that. There were three facts that the appellees have said are important, that Jim Thorpe was a Native American, he was enrolled Native American, Saxon Fox, and Saxon Fox are recognized by the United States government. Were any of his three wives Native American also? Excuse me? Were all or any of his three wives Native American, but particularly the third wife? The first and second, I believe, were where the third one was not, Your Honor. Okay. You mentioned that there were a number of interested parties potentially, the sons, the grandsons, et cetera. Was there ever any discussion about going to the committee that's set forth in the statute to try to deal with or at least give some kind of binding view on these competing claims? The only time we had a mediation with all parties at the table was the one that this was successful. But what about that question, though? That doesn't preclude, because it seems like that committee is not exactly in place for this kind of consideration, but it seems to be clearly within the wherewithal and the expertise really of that committee that's set up under the statute. But we don't have... I'm out of time, Your Honor. That's all right. But we're not in a situation, Your Honor, where we have laws to apply when there's no reason for them to apply. We don't believe that because of the contract with the wife, there is a right of possession. There's no reason to go through a whole procedure, the expense, and everything else. When you have state court that could just as easily do it, they could have brought a state court action where every lineal heir would be at the table, could have had their peace, and could have had their side. And what would have been the nature of the state court action? Asking the state court to enforce an aggra? No. No, the state court regularly has actions for exhumations. They notify, and it's required by our statute, it's cited in my brief. There's also some common law pedigree. They notify all the heirs. Everyone can come in at the time of the hearing. They can say their peace at that point in time. But that's very different than a situation where there's a specific federal statute creating certain kinds of rights. But the NAGPRA was not supposed to interfere with those rights under state court for where the wife could bury her husband. That's the savings clause, Your Honor. Thank you. Okay, well, does it specifically state that the federal district courts have jurisdiction over any action brought alleging a violation of this chapter? It doesn't mean it's exclusive. That's a whole other issue. Well, I was looking at the part that Your Honor said that would not limit any procedural substantive rights. To a P-009 you're looking at? Yeah, I'm just looking under 3009-4. Right. Thank you, Your Honor. Okay. Your Honors, I'm Dan Wheeler. I represent John Thorpe and Michael Colder, who are the grandsons of Jim Thorpe from his first marriage. They filed an amicus brief in this case in support of the borough. They want their grandfather to stay where he is. The brief was limited to only one issue. Can you move the mic up just a little bit? Oh, sure, yeah. It's fairly tall. The brief was limited to only one issue, which was the applicability of NAGPRA. We don't address the constitutional or other issues. And they obviously believe NAGPRA does not apply. And they believe that for one reason, the repatriation provisions of NAGPRA, which is what we're talking about here, they don't apply to a body resting in a grave site where he's been lawfully buried by his family or anyone else with the authority to bury him. And that's because that's not what NAGPRA was intended to reach. So where in the statute is the language that you're relying upon? The language that I'm relying on is in Sections 5 and 7 of the statute, Your Honor. Taken together, what those sections say are that museums with collections of Native American remains have to inventory them and then repatriate them upon a proper request. And that collections word was written out by the district court. The district court, in ruling, just looked at the museum definition, which says anyone with possession of Native American remains. And the court said that's enough. But that's not enough. If you read further down in the statute, it says only museums with possession of holdings or collections of Native American remains. And I'm not imposing this on the statute, Your Honor. If you look everywhere in the statute, in the regs, in the Senate report, in the House report, collection, collection, collection, it comes up, that's what Congress was trying to reach. They weren't trying to reach into graves and pull bodies out of them. That is exactly the opposite. The statute says- Well, you could have a situation, though, where a body of a single person constituted a collection under the statute, couldn't you? I don't see how you could. How could you look at- You're saying you have to have more than one body or more than one artifact to get under the statute? No, I'm saying a body in a grave, one body, 10 bodies, 100 bodies, is not a collection of Native American remains. If someone looted the grave of, say, Cotilles or Sitting Bull, looted that grave and set up some kind of a for-profit thing where they charge people $25 to look at the bones of that deceased Native American, you're saying that does not count because it's a- No, I'm saying that that might be covered under another provision of NAGPRA, but not the repatriation provisions, which is all that are relevant here. NAGPRA does a lot of other things. There are criminal penalties, there are a lot of provisions dealing with protecting a Native American grave site. That's what the statute's designed to do, protect Native American graves. That is precisely the opposite of what is allowed now in this case. Under the definitions section, though, doesn't the human remains specifically fall within the definition of what the statute's talking about? Oh, it's absolutely. There's no question that the remains, that issue here, Jim Thorpe's remains, are part of the definition. No question. The issue is if they were sitting in a museum somewhere, in a glass case, in a diorama, yes, then we have a different issue. Not resting in a grave site, Your Honor. You can go through the legislative history, you can go through the analysis reports, there's not a hint anywhere in there that this statute could apply to a body resting in a grave site. Any grave site. That's what worries me. You might be arguing too much. In my scenario, rather than putting it in a mausoleum, what if they stole the body of one of the great Native American leaders, brought it in, planted it, put it in another grave, and then charged people with admission to go look at it? Well, there is a case, Your Honor, you can take a look at it. It's the Geronimo v. Obama case, and it's the only case that's based on any fact even remotely similar to this case, where you have the heirs of, or excuse me, the descendants of Geronimo brought a case to basically have him dug up and repatriated, and that was in the case. It said, no, that is not what the statute was designed to do. But that wasn't a situation where somebody had looted the grave to get Geronimo's remains and then... Well, it's not known, actually, Your Honor. Geronimo is either buried at Fort Sill in his original grave, but there is also an allegation that it might just be a hoax, that the grave was looted and pieces of him were taken to Yale University, it's that Skull and Bone Society at Yale, and Yale was a defendant in the case, and the court still dismissed the case as to Yale. The only other thing I want to mention, Judge Singham, your point was the issue of how broad this ruling is, and hopefully nobody will laugh when I say this, but please consider the case of Elvis Presley, who is a man of partial Native American ancestry, just like Jim Thorpe, and the statute doesn't say how Native American... I wouldn't say just like Jim Thorpe. I'm sorry? I wouldn't say just like... I have a hard time getting the visual on that. I know. I was hoping nobody would laugh, Your Honor. But the statute doesn't say how Native American you have to be. Any Native American ancestry is enough to trigger the statute. As long as they're recognized, I guess, by... The tribe. They have to be certified or recognized or registered. But it could be a lineal descendant, it could also bring an action, it doesn't have to just be a tribe. And so, he's buried in a museum, and he's in the ground, but it's a museum. The only difference in this case would be whether or not Graceland has received federal funds. But would the Cherokee Nation bring a lawsuit to dig up Elvis and repatriate him to Oklahoma? I can't see a difference between those facts. They may not want him. They do a pretty nice business at Graceland, Your Honor. That is all I have. You're conceding, then, that the borough could constitute a museum? I'm not conceding it because it's a factual issue. The receipt of federal funds, and we don't argue that? Okay, well, that's a different issue. I guess there's no problem in terms of the receipt of federal funds indirectly here. That's not contested. I was asking a legal question under Subsection 8 in terms of the way museum is defined, as to whether or not a borough fits within that definition. Of course, it's a very broad definition. It's any institution or government in possession of Native American... Or government of what? A government agency. A government agency. Governments an adjective-defining agency. Correct. And so it's a very broad jurisdictional type definition. But what I say is you get further down in the statute, it gets limited. They're going after real museums with collections, glass cases, drawers full of bones. I mean, the legislative history, endless testimony about this issue, of this horrible treatment of Native American remains for centuries in this country. That's the harm they were trying to get. There's no harm here. A man was buried by his family in a grave. Why would Congress care? Why would they enact a statute to reach into that grave and get it? I just think that's not what this was about. Thank you. Thank you. Mr. Fusco, apparently you wanted to, who is Mr. Fusco? I am. Okay. So apparently you want to argue after Mr. Ward goes. Yes. Those are the court's instructions. Okay. And, Mr. Ward, you have no problem acceding, I guess, three minutes, although, as you can see, we're not that rigid on the time. Yes. That's fine. Okay. Thank you, Your Honor. May it please the Court. My name is Steve Ward, and I represent the sons of Jim Thorpe, Richard, and William Thorpe in the Second Fox Nation of Oklahoma. I'd like to begin by recharacterizing the case a little bit. I think the borough's, a lot of the borough's arguments turn both NAGPRA and the issues in this case on their head. First of all, we're not here after a repatriation proceeding has occurred. We're here on the issue of whether NAGPRA applies in this situation. We're here on basically a statutory construction problem of whether NAGPRA either applies. And if this matter goes forward, there would be a repatriation proceeding, and the review committee potentially might have a chance to address some of these issues. NAGPRA's a very broad... Well, it seems to me you're trying to paint this as a really preliminary... Is that your argument, this is really preliminary? Because it seems that if we affirm, you get a declaratory judgment, right? If you affirm, we do get a declaration that NAGPRA applies in this situation, which we believe it obviously does. But the case is not necessarily over because a repatriation has not occurred. And there are various things that have to be done to trigger the repatriation provisions of NAGPRA. And so what forum is going to ensure that occurs if we were to affirm the declaration of the borough being a museum in NAGPRA, it being subject to NAGPRA, which is the language of the district court judge's summary judgment? What happens next? Do you go back to district court? Well, the repatriation process is very simple, and it essentially would be that the borough would be responsible for issuing the required notices. Certainly, we would be glad to help identify errors and help with that process. But once the notifications have been provided, then comes the opportunity for other lineal heirs, perhaps even another tribe, to make a competing claim for repatriation. Those issues can be decided in one of two ways. There is an informal NAGPRA review committee, which is available to help address these issues, or the federal district court has jurisdiction to resolve the issues that arise in repatriation. This case, and again, going back to what I began, I believe the borough has really turned a lot of issues on its head, the Elvis Presley example and others. This case involves a really specific set of circumstances. And I think that once everyone's notified, most of the heirs might agree, the parties might agree, but whatever is left after that process could be decided in one of two ways, either by the review committee, which the parties accepted, or by a federal district court. Well, I mean, the problem is, I mean, yeah, there's this particular set of facts. But what you get from us and from every court is a decision that can be applied in other places. So, you know, it's something that we're going to be real careful about. How do you address the argument that, hey, anybody with any Native American blood from here on out might just find that despite, you know, if I had Native American blood and I wanted to be buried at the Parklawn Cemetery in North Jersey, someday I might find myself being exhumed. And moved to Graceland. Yeah. And Segarra could be buried in Graceland. Right, which would be great, I mean, I guess. Wouldn't be so great for Graceland. Yeah, that's true. Your Honor, again, it's a scary story, but the law in NAGPRA really don't work that way. It's not that simple. First of all, NAGPRA does not... NAGPRA is broad in its overall application, and actually could have been, Congress considered making it even broader to include the ability of individuals to request repatriations. As such, it was narrowed to a certain extent to be limited to Native Americans institutions and state and municipal governments. But it's broadly written human rights, civil rights legislation, which in its application is probably not going to end up being that broadly applied in most situations. Why not? That doesn't help me. And this went through my mind too, my quirk, and I discussed this. What if I expressed a desire to be buried anywhere, Philadelphia? And assuming that I have Native American ancestry, and I'm told that I do, it may be a situation that we all do, these all Native, all African Americans may well have some Native American ancestry. And whatever tribe that could be identified, decided that for whatever reason, they wanted my bones to be transferred to another place. Let's take the Iroquois Nation in upstate New York, since I grew up up there. And that motion was brought by the Iroquois Nation to move my remains to upstate New York to be buried, or around Dondogon Reservation outside of Syracuse, because I'd really take somebody off, and they've lost the idea of me rotting in frozen tundra for all eternity. Why wouldn't this statute apply? If I could be, say, identified as being Onondaga, why wouldn't the Onondaga Nation have the right to have me exhumed and shipped to the tropical shores of Lake Ontario? It's a fair question, Judge McKee, and I'd like to... It'll take me just a moment to explain, because there are a number of parts to your question. One, NAGPRA creates a right to request a repatriation. It's not necessarily an automatic repatriation, although a repatriation will occur if certain requirements are met. But second, NAGPRA did not change property laws. And I think there's... Well, that's their argument. And we respectfully disagree with the borough's analysis, though there has never been an ownership right for hundreds of years. Common law has never recognized an ownership right in remains. There is actually an obligation. Most states have burial statutes that, in anticipation of family disputes over a burial, actually decide it and place an obligation, if there's a dispute, usually on the surviving spouse, to get the body buried, to pick the location and get it buried. That's probably the rarity, but beyond that... But focusing on that, let's say that happens. Let's say that my intestate and wife decides that she wants me planted in Philadelphia. And the scenario that I just pointed out plays out, and there's a motion brought in the NAGPRA to move me to the Anadaga Nation in Syracuse. So why wouldn't the statute allow that? And this is an example the borough gave in its briefs, and I think it's unfounded entirely because if a Native American person expresses, in a reasonable way, the desire to be buried in a particular place, I think there's almost no chance that the repatriation portion of NAGPRA would ever result in... Why? Where in the statute do you find that? Because you're now saying that, yeah, the statute would apply, but the repatriation you get out of the statute would not work. The statute is fairly open-ended on that, but a review committee or a court has to decide these issues. And there's a very clear... First of all, NAGPRA recognizes that a person has the right to dispose of their own body. The regulations specifically provide that NAGPRA doesn't override a choice, a written choice, to leave a body for medical research. And I think, accordingly, if a Native American person goes to the trouble to buy a cemetery plot in a local cemetery, leaves a will expressing a desire to be buried in a particular location, there are strong legal principles that would prevent a repatriation under NAGPRA. Well, I'm looking for those legal principles, and I don't find them anywhere in NAGPRA. If I accept your argument, it seems to suggest exactly the opposite. Well, a repatriation is not necessarily automatic under NAGPRA. But that doesn't mean... You're saying, well, yeah, they can move for repatriation, but that doesn't mean they'll necessarily get the body exhumed. But NAGPRA would still apply in this situation. NAGPRA would apply... I'm trying to find out why it wouldn't apply. There would be the extra... NAGPRA essentially gives a Native American person or a tribe the ability to initiate the repatriation process. But in order to get to the end result, in order to accomplish a repatriation, a review committee and or a court ultimately would have to be convinced. And it's very difficult for me to understand how a court would ever get there or the NAGPRA review committee where a person had expressly left instructions or expressed an intent to be buried in a particular place. Why is it any different when the person's spouse expresses an intent? Well, the spouse is not the person. Well, legally, what's the difference? If the law gives the spouse the right to make that decision, and so I don't make the decision, I die intestate, but my wife makes the decision, why is that any different? You're saying had Jim Thorpe himself expressed the desire to be buried in California or Oklahoma? California, I guess. Then we wouldn't be in this situation, but we're in this situation because he died intestate and his third wife made the decision, you're saying that's the distinction? Well, in part we are, but Jim Thorpe did express a request to be buried within second Fox Indian country in Oklahoma. Is that in the record anywhere? Well, yes, it is. It's in the historical record. For purposes of this proceeding, it's not a fact directly relevant to whether NAGPRA is applicable, but it's certainly one of the facts that we presented and the borough responded about the context of this. And this is exactly the kind of situation that NAGPRA was intended to address. Well, help me understand the definition of museum. Statute says in subsection 8, museum means any institution or state or local government agency. It doesn't say state or local government entity. It doesn't say and or state or local government agency or entity. It says a state or local government agency. Can a borough be a local government agency? The entire borough? Absolutely. And the regulations as well are written broadly to define a museum broadly. And what language in the regulation would allow for a conclusion that this statute is aimed at a municipality as opposed to an agency of a municipality? Well, I think in part the definition of a museum also includes a discussion about the receipt of any federal funds. Well, that's clear. The federal funds are here. And the district court said, look, they've got the body, they get indirect federal funds, therefore it's a museum. Without really looking at the words, it's two or three lines in the district court opinion without any real analysis of the language in subsection 8. So let's assume the federal funds are there. And then we have to look at whether or not this is an institution or a state or local government agency. And that receives federal funds. That's the second part of that sentence. I don't mean to cut that off. But that's not really an issue here. And certainly, and I can't answer why the words state, local, government were used and were not used instead of agency. But certainly the overall context makes no distinction between an agency and national government. Well, you say the overall context, but you're asking us to read the word agency out of it and replace agency with, you want us to read the statute to say museum means any institution or state or local government agency or entity. You want us to insert that parenthetical after agency. So that we're not looking for an institution or an agency, but we're looking at an institution, an agency, or an entity. What if this was not the borough of these two small towns that came together to form Jim Thorpe? What if the Commonwealth of Pennsylvania decided that it was going to, perhaps even on parkland, with an agreement with a third wife, receive the remains of Jim Thorpe and do exactly what the township did here? In that case, the state of Pennsylvania would be a museum under your definition. We see no distinction between an agency, and I think that language was probably intended to capture all situations in which the state or most, in most of these situations, the land or the institution, more often than not, like probably is operated by an arm of the state. Well, the arm of the state is different. There you get into agency. There's no issue there if it's an agency or some kind of arm. That's fine, but the way the word agency and government, government being there to apply in this context, and it would allow the Commonwealth of Pennsylvania to be a museum. I think also certainly a very narrow reading of the word agency, of that definition, would become a surprise. The history of NAGPRA is, and I think that the NAGPRA website and the Department of Interior reflects most, if not the vast majority, of repatriations underway today and in the past have been against governments as well as their subdivisions. Against governments in the solid municipalities? Against states, municipalities, and in addition and as opposed to specific subdivisions. I guess my only other question is whether or not Congress foresaw a situation where they're drafting what has been labeled, and I think justifiably so, as a human rights statute arising out of the utter travesty that is this country's history, given its treatment of Native Americans, and allowing that to resolve what is at base a family dispute about where a family member is going to be buried. Does that make sense? I see my time is expired, but if I may finish my answer. The Burrough and Jim Thorpe Sons vehemently disagree that this is just a family dispute. I'm sorry. We vehemently disagree that this is just a family dispute. What this is about... Well, your own client said they waited, what, 20 years for one of the family members to die before they brought the action. That sounds kind of like a family dispute to me. Well, I think... Part of the family wants to remain where it is. There certainly may be family disagreements about this particular repatriation request, but at heart is that this removal of these remains has long been considered an injustice not only by the members of Jim Thorpe's Indian family, but also by members of the Second Fox Nation, and we respectfully believe this is exactly the situation that NAGPRA was intended to address. Thank you. Yeah, I did. I mentioned to your adversary as well, I know there was equitable defenses, in particular Latches mentioned here. I mean, you know, I wonder if other equitable defenses might apply. What we have here, I think, is it's basically a change in course, a change in litigation position, or position anyway, after the borough spent a fair amount of money and continues to spend money on upkeep. Does another, you know, an equitable estoppel or something, should that apply here? Well, I'd answer in two ways. I mean, the same argument could be made by any institution or government or museum which has maintained either artifacts or remains in its collection. But in this one, the family agreed. At least the person who could agree did agree. Everybody stood by it for 55 years. Then, you know, once, you know, enough people passed on, they took a new position. Is that the kind of thing a court ought to be countenancing? Yes, I think so. I think the same situation arises under disinterment statutes that every state has. I mean, those statutes, again, emphasize that there's no permanency under the law in a burial. A burial is made, the decision is made in accordance with state law, if not by agreement of the family. But a burial is not necessarily forever. In a family of 12, 11 of the children die, the remaining child, even in the general law context, can certainly make a decision that I would have preferred to have my parents buried in the old family cemetery in the country as opposed to here. It's not frequent. It does happen. And it's not frequent, and I also think that the concerns about NAGPRA having too broad a reach and resulting in unusual situations really is not founded because of the cost, because of the other factors that would go into getting a confirmation of a repatriation decision. If we can just quickly then address the Savings Clause issue, subsection 4 of section 3009 that says, Nothing in this chapter shall be construed to limit any, and I'm abbreviating, substantive right which may otherwise be secured to individuals. Why wouldn't, if we follow your interpretation, why wouldn't we be abrogating that Savings Clause? Because there is a substantive right on the part of the third wife here under state law to determine where her husband would be buried. Your Honor, I have to answer that by respectfully saying we disagree that the third wife had substantive property rights in the burial. But don't put the word property right in there because then you have probate exception and that creates all kinds of issues. But you're saying she didn't have a right under California law to decide where her intestines would be buried? She did and she exercised it, but the burial is not forever. Oh, okay, I got you. So it's kind of like, what is that movie, The Gazebo, where the body keeps popping up. You're saying that you have a right to determine where the person is going to be buried, but as you just said, burial is not forever. So I have no idea how that works or how that would work. You've got a right to determine where the person would be buried, but it phases out over time so that after a week, the person can be exhumed by someone else and moved? I have no idea how that would work. I certainly don't intend to be flipping that response, but as our briefing indicates, the law on this issue, and it's not law that very often comes to court either because these issues don't come up that often. But essentially, once the initial burial decision is made, the body is owned by the law. You can't be serious. You've got as straight a face as anyone can have, but you can't be serious making that argument to me. You're saying that if I die intestate and my wife decides where I'm going to be buried, she has that right, but that right only gets me into the ground. It doesn't keep me there. And once I'm in the ground, my body is owned by the law, whatever that is. That's what you're saying? The law controls the further disposition the body's following the initial burial decision. Is there a Pennsylvania statute or something that covers this? You said it happens, but not often. Or is this a common law thing? I believe every state in the union has a reinterment or a disinterment statute. Do you know if Pennsylvania does? It does have one. Do you know what the citation of it is? No, sir, I don't. I believe it's discussed in our briefs. If under that statute, her decision once made, and this would be under California law, her decision once made would be final, that nothing in that statute would interfere with her decision, then would the Savings Clause come into play? It would somehow nag her, trump anything in the California law that allows her to determine where? Perhaps, but it's not the case because the initial burial decision... Well, how can you say it's not the case because you said you didn't know what the law was? Oh, you said Pennsylvania. I'm sorry, okay. You're talking about Pennsylvania. Go ahead. Well, I don't know that I can speak to the law in every state, but they are... Just focus on California. They're all very similar. They allow, in Pennsylvania, my recollection is that a family, a lineal heir, lineal descendant, seeking to have a grave moved to another location, files an application either with the county clerk or the, I believe the county clerk, and a notice is published, and if there are eventually, the process ends up in the lower court. But I assume that they have to have some reason to have the body moved. It can't just be that, well, I found a place with a better view. There's got to be some reason to have the body moved. Well, indeed, and NAGPRA is really an embodiment of the same common law approach to burials. It gives, because of the history, Native Americans the ability to initiate a repatriation when there was a history of their being deprived decisions such as this by states. Right, but that brings me back to Subsection 4 and what it means. So if we take a look at California law, and we find nothing in California law which would apply to a situation like this, where there's a family dispute, and I know you don't agree with that characterization of this, that would allow one family member to countermand the If there's nothing like that in California law, then you would agree that under the Savings Clause, that the Savings Clause would control, that we're looking at a situation where in order to imply or enforce NAGPRA, we'd be abrogating a substantive right of the third wife. I think I would have to agree with your analysis, but if the right to choose the initial burial location is a permanent property right in the surviving spouse, which is just not the case. Okay, well, your idea of permanent and my idea of permanent are two really different things. Well, I understand. Okay. Actually, you do discuss it. I take it back. You're, page 30 and 31 on your brief, you talk about it. It's a reasonable cause requirement under Pennsylvania law. Okay. Mr. Wood, thank you. Anything else you want to say, Mr. Wood? Well, thank you. Okay. Mr. Fosco? Good afternoon, Your Honors. May it please the Court, Christopher Fosco, Callahan and Fosco, for the appellees on the individual defendants in the motion to dismiss. I have a very limited period of time here, Your Honor, so I will respectfully rely on our brief and highlight a couple of issues. Are you really focusing on the 1983 action? Only, Your Honor. Okay. Only, Your Honor. Judge Caputo correctly held below that the Supreme Court has dictated that the dividing line for the application of 1983 relief depends on whether a statute has an express relief or not. NAGPRA, by its clear language found in Section 3013 entitled Enforcement, provides a clear private remedy by stating that the district court shall have jurisdiction over any action brought by any person alleging a violation of this act and shall have the authority to issue such orders as may be necessary to enforce the provisions of this act. Your Honors, I submit that this is an explicit private remedy with no congressional mention textual or otherwise of authorizing additional relief as found in Section 1983. I submit that Justice Scalia in the Rancho Palos Verdes decision clearly stated that statutes providing their own private remedies demonstrate an existence of congressional intent not to have the application of 1983. The thing that struck me here is, even if you're wrong, what would the measure of damages be? I couldn't imagine how you'd measure damages. I agree, Your Honor, and I think we get stuck on the cross appellants and the word elaborate. What does elaborate mean? To me, it's code for money damages and attorney's fees that is found in 1983, and that would be a very important question I simply could not answer. What would their damages be? How would you quantify that in the issues that have been discussed before my part of this case? I think it would be impossible, and I also think that demonstrates why 1983 application is so unavailable in this case and is completely supplanted by the private remedy. I also would point out respectfully, Your Honor, that from all the arguments that have come before me, from references to Graceland and Elvis, which I simply don't have. You don't have references to Elvis? No, it's very hard to follow a Graceland-Elvis reference. I got it. I was thinking some sort of silly heartbreak hotel thing, but it's not going to work. No, you're right. It's not going to work. It's not going to work. So I didn't do it. But it shows you that there's obviously hotly contested issues about a private remedy that is in effect in this case, and that is where the court can stop when it comes to 1983. I will also submit to Your Honors that basically the same cases have been cited by both parties with very different outcome, meaning that a private remedy, whether it's elaborate, narrowly tailored, custom, limited, is congressional intent not to have 1983 application. I see I'm out of time. Thank you, Your Honors. Thank you. When I first saw your name, I thought it was DeFusco, who is one of my favorite lawyers of all time. She's a public defender here in Philadelphia, and she's fabulous. And I thought that maybe you were her husband, but she is DeFusco, not Fusco. No. No, no. Thank you, Your Honor. Thank you. Mr. Schwab, is there some time? Yes, Your Honor. There were two items that I'd like to at least address. I hope one of them is not Graceland. No. Okay. No, Elvis was never. It was before my time. Not much, but before my time. It wasn't before mine. One of the items that Mr. Ward raised was this repatriation proceeding, as though it's a very nonchalant nothing to happen. But if this Court finds the borough to be a museum, then we have to follow all of NAGPRA, not just what we want to follow. That means we're going to have to do an inventory under Section 5. To do an inventory after we've lost 50 years of history, the wife that says what's in the coffin, the daughters that say what's in the coffin, the borough fathers who are long gone after 50 years, we may have to do an exhumation to do the inventory to comply with NAGPRA to get to the repatriation. I know it sounds absurd, but we can't pick and choose what we want under NAGPRA. And that's something that's troubling. Maybe it can be done by X-ray. I don't know. I'm a country's general practitioner, so this is beyond me in those cases. The other, Your Honor, you asked for the Pennsylvania site. It's 20 Pennsylvania Consolidated Statutes 705. We discuss it in pages 34 to 35 and 36 of our brief. Pennsylvania is a bit unique when it comes to exhumations. We do have a statute, but we have a long case law history, a Pettigrew case that goes back to 1904 and gives standards of what a court has to look like with all lineal heirs involved. Those were the two items that I did want to address. I don't know if there are other questions the court may have or not. I did want to ask you if this process were to continue with a repatriation request, in that form you would make your argument presumably that the borough had the right of possession or control over the remains. What authority would you be presenting to the decision maker to show that by statute you would be able to retain control over the remains? We have the contract and California and Pennsylvania law that gives the spouse the right to or next of kin that comes right under the right of possession. There's a Senate report that I've cited in my brief that says, you know, that's the idea. The next of kin gave consent. We have that right. That's one document we have. It hasn't been lost. But the next of kin language is in the definitional section of what right of possession means. If the only time those words were used, does that impact your ability to rely on it with the force of law as opposed to just a definition? I don't. I see a definition as a part of the statute. That word, it says everywhere in the statute the right of possession is mentioned. This is what it means. Thank you. Thank you, everyone. It's a very difficult case in a whole lot of ways. Obviously it raises some very difficult and troubling issues in how this thing comes out. And we appreciate the sensitivity and the thoroughness with which both sides have looked at this issue and tried to help us out. So thank you very much. Have a safe trip back.